# EXHIBIT A

PASSAIC SUPERIOR COURT
PASSAIC COUNTY COURTHOUSE
77 HAMILTON STREET
PATERSON          NJ 07505

TRACK ASSIGNMENT NOTICE

COURT TELEPHONE NO. (973) 653-2910
COURT HOURS  8:30 AM - 4:30 PM

                    DATE:   DECEMBER 28, 2021
                    RE:     MCMILLAN COLEMAN  VS PEPPERIDGE FARM INCO RPORATE
                    DOCKET: PAS L -004049 21

     THE ABOVE CASE HAS BEEN ASSIGNED TO:  TRACK 2.

     DISCOVERY IS  300 DAYS AND RUNS FROM THE FIRST ANSWER OR 90 DAYS
FROM SERVICE ON THE FIRST DEFENDANT, WHICHEVER COMES FIRST.

     THE PRETRIAL JUDGE ASSIGNED IS:  HON THOMAS J. LACONTE

     IF YOU HAVE ANY QUESTIONS, CONTACT TEAM       001
AT:  (973) 653-2910 EXT 24234.

     IF YOU BELIEVE THAT THE TRACK IS INAPPROPRIATE YOU MUST FILE A
 CERTIFICATION OF GOOD CAUSE WITHIN 30 DAYS OF THE FILING OF YOUR PLEADING.
     PLAINTIFF MUST SERVE COPIES OF THIS FORM ON ALL OTHER PARTIES IN ACCORDANCE
WITH  R.4:5A-2.
                    ATTENTION:
                         ATT: CHARLES J. KOCHER
                         MCOMBER MCOMBER & LUBER, PC
                         54 SHREWSBURY AVE
                         RED BANK          NJ 07701


ECOURTS

Matthew A. Luber, Esq. – NJ ID # 017302010
  mal@njlegal.com
Charles J. Kocher, Esq. - NJ ID # 016952004
  cjk@njlegal.com
Tyler J. Burrell, Esq. - NJ ID # 377942021
  tjb@njlegal.com
McOmber McOmber & Luber, P.C.
39 E. Main Street
Marlton, NJ 08053
(856) 985-9800 Phone
(856) 263-2450 Fax
*Attorneys for Plaintiff Coleman McMillan and Putative New Jersey Class*

| | |
|---|---|
| COLEMAN MCMILLAN, on behalf of himself and all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> PEPPERIDGE FARM, INCORPORATED, ABC CORPORATIONS 1-5 (fictitious names describing presently unidentified business entities); and JOHN DOES 1-5 (fictitious names of unidentified individuals), <br><br> Defendants. | SUPERIOR COURT OF NEW JERSEY <br> PASSIAIC COUNTY <br> LAW DIVISION <br><br> DOCKET NO.: <br><br> Civil Action <br><br> **CLASS ACTION COMPLAINT & DEMAND FOR TRIAL BY JURY** |

Plaintiff Coleman McMillan ("Plaintiff") and all others similarly situated deliver food products to retail stores and other end users on behalf of Defendant Pepperidge Farm, Incorporated ("Defendant" or "Pepperidge Farm") pursuant to form contracts like those attached as Exhibit A (Plaintiff's Consignment Agreement). In this class action lawsuit arising from Defendant Pepperidge Farm's misclassification of its delivery drivers for sales territories in the State of New Jersey as "independent contractors," Plaintiff alleges that Defendant Pepperidge Farm has subjected them to improper pay deductions in violation of the alleging violations of the New Jersey Wage Payment Law ("NJWPL"), N.J.S.A. §§ 34:11-4.1, et seq., and, as such, Defendant

Pepperidge Farm has been unjustly enriched under New Jersey common law. Plaintiff, on behalf of himself and all others similarly situated, seek all damages available under these claims.

## PARTIES

1. Plaintiff Coleman McMillan resides in 512 Clove Rd., Staten Island NY 10310. He has been a Pepperidge Farm distributor with a territory in New Jersey since October 5, 2018.

2. Defendant Pepperidge Farm is a Connecticut corporation with its principal place of business at 595 Westport Ave., Norwalk Connecticut 06851. Defendant Pepperidge Farm misclassifies its employees, who deliver and stock baked food products from its New Jersey distribution centers, as independent contractors. Defendant Pepperidge Farm is and was, at all relevant times, an employer under New Jersey law.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over Pepperidge Farm because it is an employer under New Jersey law. Upon information and belief, Pepperidge Farm has employed hundreds of Distributors in New Jersey during the Class Period. https://www.pfroutes.com/en-US/search?facetstate=nj (last visited November 30, 2021).

4. Venue is proper pursuant to Rule 4:3-2(b) because Plaintiff's claims arose, in part, in Passaic County, New Jersey and Pepperidge Farm directed business into Passaic County, New Jersey. At all relevant times, Plaintiff worked for Pepperidge Farm in Passaic County, New Jersey. Ex. A at Schedule A ("Description of Territory").

## FACTS

5. Pepperidge Farm maintains a network of Distributors in New Jersey to distribute its biscuit and snack products throughout the State of New Jersey.

6. Pepperidge Farm sells its products to various retail stores such as grocery stores,

2

mass merchandisers, and convenience stores and relies on its Distributors to deliver its products to market. Distributors deliver, stock, merchandise, promote, and remove Pepperidge Farm products for stores in defined territories.

7.      Plaintiffs and Class Members performed delivery, stocking, merchandising, promotional, and removal services on behalf of Pepperidge Farm in New Jersey.

8.      Upon information and belief, Pepperidge Farm has employed hundreds of Distributors in New Jersey during the Class Period. https://www.pfroutes.com/en-US/search?facetstate=nj (last visited November 30, 2021).

9.      In order to perform work for Pepperidge Farm, Plaintiff and similarly situated Distributors signed a Pepperidge Farm "Consignment Agreement" (hereinafter "Agreement"), which detailed the terms of Distributors' work for Defendant and labels Distributors as "independent businessm[e]n." A copy of Plaintiff's Agreement is attached to this Complaint as Exhibit A and is, upon information and belief, substantially similar in substance to the Agreements signed by the putative Class Members that Plaintiff seeks to represent. While Distributors pay for the opportunity to enter into these Agreements and to secure an assigned distribution territory, Pepperidge Farm's right to control, and extensive actual control, over Plaintiff and Class Members is such that the Distributors are actually employees under New Jersey law.

10.      Pepperidge Farm retained the right to terminate Distributors' contracts at any time without cause. The Agreement states, "[Defendant] shall have the right in its discretion to terminate this Agreement at any time, upon written notice to the Consignee, for " Exh. A at ¶ 23.

11.      In addition, Pepperidge Farm also retained the right to terminate Distributors' contracts at its discretion for cause. Exh. A at ¶ 19. Defendant's "for cause" grcunds for

3

termination, as stated in Distributors' Agreements, reserved the right for Defendant to exercise

extensive control over the details of Distributors' work. Defendant retained the right to

terminate Distributors' contracts for "failure of [Distributor] to realize the sales potential of the

Territory and [Distributor's] failure to make satisfactory improvement within thirty days after

notice of inadequacy. . . ." Exh. A at ¶ 19(a). In order to use their best efforts to fully realize the

sales potential of their routes, Distributors were required by the terms of the Agreement to:

    a.    "actively solicit all retail stores in the Territory whose accounts can by [sic] profitably handled;"

    b.    "maintain at all times an adequate and fresh supply of Consigned Products in all such retail stores;"

    c.    "provide distribution service to all such retail stores on such days of the week (including weekends), at such intervals and with such frequency as is necessary to realize the full sales potential thereof and to maintain an adequate fresh supply of Consigned Products therein;"

    d.    "make available to all such retail stores all varieties of authorized Consigned Products unless it is demonstrably unprofitable to do so;"

    e.    "cooperate with [Defendant] in the effective utilization of [Defendant's] advertising, sales promotion, and space merchandising programs and;"

    f.    "keep fully informed of [Defendant's] recommended policies and method for increasing sales and improving distribution service." Exh. A at ¶ 4.

12.    Distributors' contracts could also be terminated for cause for the following reasons, which

gave Pepperidge Farm great latitude in determining how Distributors carried out their duties:

a.    the "failure of [Distributor] adequately to realize the sales potential of the

Territory and [Distributor's] failure to make satisfactory improvement within thirty

days after notice of inadequacy from [Defendant]" Exh. A ¶19(a);

b.    the "failure of [Distributor] to maintain the general appearance and

condition of its truck(s) or other equipment, the general appearance or deportment

or that of its officers, directors, employees, agents, representatives, or helpers, in

accordance with standards in keeping with the established reputation of

[Defendant] and the high quality of its products and the continuance of such failure

for more than five days after written notice thereof from [Defendant]" Exh. A

¶19(c); or

c.    "any actions, activities or practices of [Distributor or agents] which either

do, or in the opinion of [Defendant] are likely to, materially damage the reputation

of [Defendant] and/or [Defendant's] relations or reputation with consumers, retail

stores, or any other purchaser of Consigned Products." Exh. A ¶19(f).

13.    Defendant Pepperidge Farm employed sales managers who supervised

Distributors' work, including that of Plaintiff.  Through its sales managers and other agents,

Defendant conducted regular evaluations of Distributors' sales and store performance.  If a

Distributor's performance was deemed inadequate, Defendant retained the right to send the

Distributor a letter requiring that he or she remedy performance within five days, or Defendant

could make other arrangements to service the store and could even terminate the Distributor's

contract.  Exh. A at ¶ 7.

14.    Pepperidge Farm retained the right to "establish reasonable sales and/or distribution

goals for [Distributor] and this Distributorship" and required that Distributors "shall either meet

or exceed such goals." Exh. A at ¶ 4 (emphasis added). Defendant's sales managers often set such goals for Distributors throughout the year. Under the terms of Defendant's Agreement, failure to meet or exceed Defendant's sales or distribution goals was "for cause" grounds for termination of a Distributor's contract. See Exh. A at ¶¶ 19(a), (b), (d).

15.     Pepperidge Farm retained the right to exercise control over the manner and means of accomplishing the delivery of its products to market through its Distributors. Defendant requires Plaintiffs and other members of the Class to perform their duties under the policies, procedures, pricing and promotions set by Defendant Pepperidge Farm. Defendant provided Distributors with schematics, or "plan-o-grams," which depicted precisely how its Distributors should display the products that they delivered to stores. Pepperidge Farm, not Distributors, determined the wholesale price of its product. Pepperidge Farm directed the number of times that Distributors should visit their stores each week and monitored Distributors' activity through its sales managers and its billing and ticketing systems. Pepperidge Farm retained the right to require that Distributors attend quarterly sales meetings where sales managers informed Distributors of Defendant's upcoming promotions and praised Distributors with the highest sales numbers. Pepperidge Farm also negotiated the space for its products at the stores its Distributors serviced. If stores did not wish to receive deliveries from Defendant's Distributors, Pepperidge Farm retained the right to make other arrangements with the store for the delivery of its products. See Exh. A at ¶ 8.

16.     Pepperidge Farm determined the days that its Distributors could pick up their product from the warehouse.

6

17.     Pepperidge Farm disciplines its Distributors and its policies and practices regarding such discipline, as set forth in its common Agreements, demonstrate control over its Distributors that an employer has over its employees. Exh. A at ¶ 7.

18.     Pepperidge Farm also required that its Distributors purchase and maintain a specialized handheld device, along with a printer, that transmitted detailed information about Distributors' deliveries, including when these deliveries occurred and to which stores.  Pepperidge Farm charges its Distributors fees associated with weekly maintenance of its handheld device, among other charges for supplies.

19.     Defendant contacts Plaintiffs and the Class regularly via the handheld computer device called an "HHC", emails, regular mail, text message, and/or via phone calls regarding communications such as, without limitation, stores needing Defendant's products, placement of product in stores, and/or promotions of Defendant.

20.     Despite Defendant's extensive right of control over Distributors' work, Defendant has routinely classified Distributors as independent contractors.

21.     Even though Pepperidge Farm labeled "independent businessm[e]n," Distributors were not permitted to sell their Distributorships without "prior written approval of [Defendant]". Exh. A at ¶¶ 15, 18.  Defendant required that any buyer of Plaintiffs' Distributorships meet Defendant's requirements as to "character, ability, financial responsibility, business acumen, and adequate facilities. . . ." Id. at ¶ 18. Defendant retained the right to interview prospective buyers and require that Plaintiffs' prospective buyers submit a business plan to Defendant, which Defendant would have to approve in order for a sale to take place.  Defendant retained "its Right of First Refusal" for any sale of all or any portion of the Distributorship.  Id.

7

22.     Upon information and belief, Defendant misclassified Plaintiffs and similarly situated Distributors knowingly and willfully.

23.     Pepperidge Farm has paid Plaintiff and Class Members under a common compensation plan and policy where Distributors were paid a sales commission based on the items sold.

24.     As a result of Defendant's misclassification of Distributors as "independent contractors," Defendant has failed to indemnify Plaintiffs and similarly situated Class Members for employment-related expenses, including the cost of providing appropriate vehicles and vehicle expenses such as fuel, maintenance, repair; the cost and maintenance of a handheld device and printer; the cost of warehousing Defendant's products; pallet fees that Defendant charged Plaintiff and similarly situated Class Members; expenses incurred as the result of stale products and/or inventory irregularities; and the cost of required business liability insurance.

25.     As a result of Defendant's misclassification of Distributors as "independent contractors," Defendant has unlawfully collected and withheld earned wages through deducting, without limitation:  pallet fees/assessments, the cost and maintenance of a handheld computer device(s) and printer(s), and charges incurred as the result of stale products and/or inventory irregularities.

26.     The policies related to any deductions from the wages of Plaintiff and the Class regarding stale products were set by Defendant only without any negotiation or participation by Defendant's Distributors.

27.     As a result of Defendant's misclassification of Distributors as "independent contractors," Defendant has willfully and knowingly subjected Plaintiff and similarly situated

8

Class Members to unlawful deductions and has failed to reimburse Plaintiff and other Class Members for the types of work-related expenses set forth above.

## CLASS ACTION ALLEGATIONS

28.     This action is brought by Plaintiff as a class action pursuant to Rule 4:32 and for all claims asserted herein, on behalf of themselves and the following, initially defined, New Jersey Class: All persons or entities who have been employed by Defendant Pepperidge Farm as Distributors under its Agreements with territories in the State of New Jersey at any time within six years preceding the filing of this action (hereinafter "New Jersey Class" or "Class").

29.     Class action treatment of this action is appropriate because all of the class action requisites of Rule 4:32 are satisfied.  In particular:

30.     Numerosity – R. 4:32-1(a)(1).  Although the exact number of Class Members is uncertain, and can only be ascertained through appropriate discovery, including discovery of Defendant Pepperidge Farm agreement records, the Class is so numerous that the joinder of all members is impracticable.  See https://www.pfroutes.com/en-US/search?facetstate=nj (last visited November 30, 2021).  The Class is comprised of an easily ascertainable set of persons or entities who performed worked for Defendant Pepperidge Farm as a Distributor in New Jersey within the past six years.

31.     Commonality – R. 4:32-1(a)(2); (b)(3). There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members. Questions of law and fact are common to all class members, because, *inter alia*, this action concerns Defendant's common business policies, as described herein.   These common questions of law and fact include, without limitation:

    a.      Whether Defendant engaged in the conduct as alleged herein;

9

b. Whether Plaintiffs and the Class Members were misclassified as "independent contractors" when they were actually employees;

c. Whether Plaintiffs and the Class Members were deprived the protections of employee status under the law;

d. Whether Defendants were unjustly enriched by their common business practices; and/or

e. Whether Plaintiff and the Class Members are entitled to damages, and the amount of such damages.

32. Typicality – R. 4:32-1(a)(3). Plaintiff's claims are typical of the claims of the Class Members in that Plaintiff, like all Class Members performed worked for Defendant Pepperidge Farm as a Distributor in New Jersey within the past six years.

33. Adequacy of Representation – R. 4:32-1(a)(4). Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has retained counsel who are experienced in consumer class-action litigation. Plaintiff has no interests which are adverse to, or in conflict with, other members of the Class.

34. Superiority of Class Action – R. 4:32-1(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Moreover, absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.

a. The prosecution of separate actions by the individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards

10

of conduct for Defendants.  In contrast, a class action presents far fewer management difficulties, conserves judicial as well as the parties' resources, and protects the rights of each Class Member.

## COUNT ONE

### VIOLATION OF THE NEW JERSEY WAGE PAYMENT LAWS

35.     All previous paragraphs are incorporated as though fully set forth herein.

36.     Plaintiff and the class members are employees entitled to the NJWPL's protections.

37.     Defendant is an employer required to pay Plaintiff and the class members in accordance with the NJWPL.

38.     The NJWPL generally provides that "[n]o employer may withhold or divert any portion of an employee's wages."   See N.J.S.A. §§ 34:11-4.4.   The types of wage withholdings/diversions described above in Paragraphs 24-25 are not exempted from this general prohibition.

39.     Defendant has violated the NJWPL by subjecting Plaintiff and other class members to the wage withholdings/diversions in violation of the NJWPL.

40.     Defendant's unlawful deductions from Plaintiff and the New Jersey Class Members' wages denied/denies them compensation to which they were/are legally entitled to receive.

## COUNT TWO

### UNJUST ENRICHMENT

41.     All previous paragraphs are incorporated as though fully set forth herein.

42.     The New Jersey doctrine of unjust enrichment permits a plaintiff to recover from a defendant where (i) the defendant was enriched; (ii) at the expense of the plaintiff; and (iii) it

would be against equity and good conscience to permit defendant to retain what plaintiff seeks to recover. Under such circumstances, a plaintiff must be compensated for the benefits unjustly received by the defendant.

43. Under the unjust enrichment doctrine, Plaintiffs and all New Jersey Class members seek the recovery of monies retained by Defendant due to Pepperidge Farm's business practice of requiring Distributors to incur the types of operating expenses ordinarily incurred by employers. These operating expenses include, without limitation, pallet fees/assessments, gasoline expenses, vehicle expenses, vehicle insurance, liability insurance, the cost and maintenance of a handheld device(s) and printers(s), including cellular data fees for the handheld device(s). Defendant has avoided such expenses by misclassifying Plaintiffs and the Class Members as non-employee contractors even though Defendant both retains and exercises the right to control the most significant aspects of the Distributor position. Under such circumstances, it is inequitable for Defendant to retain the benefits of the misclassification.

44. Moreover, if the Court determines that any Plaintiff or group of class members is not in privity of contract with Defendant or that the pay deductions associated with the NJWPL claim are not governed by the contract, then such Plaintiff or group of class members will invoke the unjust enrichment doctrine to recover the value of the pay deductions that are the subject of the NJWPL claim. Under the circumstances alleged herein, it would be inequitable for Defendant to retain the benefits associated with such claims.

## PRAYER FOR RELIEF

**WHEREFORE**, based on the foregoing allegations, Plaintiff respectfully requests that the Court:

a)      Certify the putative New Jersey Class;

b)      Appoint Plaintiff McMillan the Class Representative of the New Jersey Class;

c)      Enter judgment against Defendant and award the reimbursement to Plaintiff and the New Jersey Class of all improper pay deductions, fees, charges, and/or other out-of-pocket expenditures;

d)      Order Defendant to pay all costs and fees, including attorneys' fees;

e)      Order Defendant to pay liquidated damages pursuant to the New Jersey Wage Payment Law and/or the New Jersey Wage Theft Act during the class period;

f)      Order Defendant to pay pre- and post-judgment interest;

g)      Order all available declaratory and/or injunctive relief; and

h)      Grant other such relief as the interests of justice may require.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury on all issues.

McOMBER, McOMBER & LUBER P.C.
*Attorneys for Plaintiff Coleman McMillan and Putative New Jersey Class*

By: */s/ Charles J. Kocher, Esq.*
Charles J. Kocher, Esq.

Dated:   December 28, 2021

## DESIGNATION OF TRIAL COUNSEL

Pursuant to R. 4:25-4, CHARLES J. KOCHER, ESQUIRE is hereby designated as trial counsel for Plaintiff.

## CERTIFICATION

Pursuant to R. 4:5-1, it is hereby certified that, to the best of my knowledge, there are no other civil actions or arbitration proceedings involving this matter with respect to this matter and no other parties need to be joined at this time. I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

McOMBER, McOMBER & LUBER P.C.
*Attorneys for Plaintiff Coleman McMillan and Putative New Jersey Class*


By: */s/ Charles J. Kocher, Esq.*
Charles J. Kocher, Esq.

Dated:  December 28, 2021

# EXHIBIT A

2001 – CORPORATION/LLC

# PEPPERIDGE FARM

# CONSIGNMENT AGREEMENT

\* \* \*

**PEPPERIDGE FARM, INCORPORATED**
**595 WESTPORT AVENUE**
**NORWALK, CONNECTICUT  06851-4482**

**HEREBY GRANTS**

**AN**

**EXCLUSIVE DISTRIBUTORSHIP**

**TO**

**DISTRIBUTOR NAME: NOBODY OWNS ME, LLC**
**DISTRIBUTOR ADDRESS: 512 Clove Rd., Staten Island, NY 10310**

**AS A**
**CONSIGNEE**
**WITHIN THE TERRITORY AND UPON THE**
**TERMS STATED IN THE FOLLOWING PAGES**

**WITH GUARANTY BY**

**GUARANTOR NAME: Coleman McMillan**

**GUARANTOR ADDRESS: 512 Clove Rd., Staten Island, NY 10310**

**AS GUARANTOR**

Campbell Soup Company and
Pepperidge Farm, Incorporated
595 Westport Avenue
Norwalk, CT 06856

Dear Sir/Madam

In connection with my purchase of a distributorship (the "Distributorship") granting me the right to distribute certain "Pepperidge Farm" products, I have entered or will enter into a Consignment Agreement (the "Consignment Agreement") with Pepperidge Farm, Incorporated ("Pepperidge.") I propose to finance a portion of the purchase price (the "Purchase Price") which I paid or will pay for the Distributorship by a loan (the "Loan") from Banc of America Leasing & Capital, LLC. The Loan will be evidenced by my promissory note (the "Note") payable to the order of the Bank and will be secured under the terms of a Financing Security Agreement (the "Security Agreement") by a lien on certain collateral, including my rights under the Consignment Agreement (the "Lien").

It is my understanding that as a condition of the Loan, the Bank has required Campbell Soup Company ("Campbell"), which is Pepperidge's parent company, to guaranty the full and prompt payment and performance of all my obligations and liabilities to the Bank and that as a concession to me, at my request and in order to facilitate the Loan pursuant to the Bank's requirements, Pepperidge has arranged for, and Campbell's has agreed to provide, such guaranty on the condition that I execute and deliver this letter agreement. It is my further understanding that under the terms of a Distributor Loan Program Agreement among Campbell, Pepperidge and the Bank (the "Loan Agreement"), the Note, the Security Agreement, the Lien and all relevant collateral may, under certain circumstances, be sold, assigned or negotiated to Pepperidge.

Therefore, in consideration of Campbell's guaranty of the payment and performance of my obligations and liabilities under the Note (the "Guaranty"), Pepperidge's having arranged for such Guaranty and other consideration which I acknowledge that I have received, I agree as follows:

    1.  I will pay, when due, all principal, interest and other sums owed under the Note, including, without limitation, all penalties, late charges, default interest rates, attorneys' fees and expenses and collection costs and will perform, in a timely manner, all my obligations and duties under the terms of the Note and the Security Agreement.

    2.  In the event that Pepperidge and/or Campbell (hereinafter referred to individually or collectively, as the case may be, as the "Guarantor") is obligated by the Loan Agreement or the Guaranty to pay any money to the Bank, the Guarantor shall be subrogated to the rights of the Bank to the extent of all amounts so paid, and I will reimburse the Guarantor immediately, upon demand, all amounts so paid by the Guarantor, including, without limitation, all principal, interest, penalties, late charges, default interest rates, attorneys' fees and expenses and collection costs.

    3.  I will indemnify, defend and hold the Pepperidge and Campbell harmless from and against all demands, claims, actions, losses, damages, costs and expenses, including reasonable attorneys' fees and expenses, asserted against, imposed upon or incurred by either of them in connection with the Loan Agreement or the Guaranty or Pepperidge's purchase of the Note.

    4.  If I should fail to pay when due any principal, interest or other sum payable under the Note or the Security Agreement, if I should fail to perform or comply with any material term or condition of the Note, the Security Agreement or this letter agreement or if there should occur any default or event of default under the Note, the Security Agreement or this letter security agreement, such failure, default or event of default shall constitute and be deemed to be a failure to perform or comply with a material term of the Consignment Agreement and shall constitute grounds for termination of the Consignment Agreement for cause.

5. Any money that I owe to either Pepperidge or Campbell as a result of (a) the Loan Agreement, (b) the assignment, sale, transfer and/or negotiation of the Note, the Security Agreement, the Lien and or any collateral to Pepperidge, (c) Pepperidge's being the owner and/or holder of the Note or (d) this letter agreement is hereafter referred to as the "Guaranteed Debt." The Guaranteed Debt shall be deemed to be owed to Pepperidge under the terms of my Consignment Agreement, and Pepperidge shall have a first priority security interest in and lien upon my Consignment Agreement and the Distributorship as security for the repayment of the Guaranteed Debt. My failure to pay all or any part of the Guaranteed Debt, when due, shall constitute and be deemed to be, a failure to perform or comply with a material term of my Consignment Agreement and shall constitute ground for termination of the Consignment Agreement for cause. The Guaranteed Debt may be charged to my account with Pepperidge and Pepperidge may at any time, from time to time, deduct from any money otherwise owned to me by Pepperidge the amounts necessary to pay all or any part of the Guaranteed Debt.

6. All money owed by me to the Bank, Pepperidge or Campbell under the Note, the Security Agreement, the Consignment Agreement and/or this letter agreement must be paid in full by me or on my behalf at or prior to any sale or transfer of the Distributorship or assignment of the Consignment Agreement. Any consent by Pepperidge pursuant to the terms of the Consignment Agreement to the sale or transfer of the Distributorship is, and shall be deemed to be, contingent upon the payment, in full, of all such money owed by me. Pepperidge is irrevocably authorized, in connection with any such sale, transfer or assignment to make such arrangements as it shall deem necessary or appropriate to effect such payment in full; and in the event that such payment in full is not effected at or prior to the closing in respect of such sale, to refuse to allow the sale to be effected.

7. I hereby represent and warrant that (a) the Note and Security Agreement have been duly authorized, executed and delivered by me and, if there are any co-obligors under the Note, by all such co-obligors; (b) the Note and Security Agreement are in full force and effect and constitute the valid and binding obligations of me and any co-obligors; and (c) the Loan has not been and will not be used for any purpose other than the payment of the Purchase Price.

8. I acknowledge that the Note and Security Agreement may be sold and assigned to Pepperidge.

If the foregoing is acceptable to you and comport with your understanding of our agreement, please sign and return the enclosed copy of this letter agreement to me on behalf of both Pepperidge and Campbell.


APPROVED:                                    APPROVED:

NOBODY OWNS ME, LLC                           PEPPERIDGE FARM, INCORPORATED


By: _____                By: _____
Coleman McMillian                            Erin Pulito
Its: President                               Its: Director, Distributor & Market Development

## DEFINITIONS

(a) BAKERY —— refers to PEPPERIDGE FARM, INCORPORATED, the grantor of the Distributorship, a Connecticut corporation having its principal office in Norwalk, Connecticut.

(b) CONSIGNEE —— refers to the grantee of this Distributorship identified on the cover page of this Agreement.

(c) TERRITORY —— refers to the territory described in Schedule A hereto.

(d) CONSIGNED PRODUCTS —— refers to those products listed in Schedule B hereto (subject to modification per Paragraph 10) but only when packaged or wrapped in retail packaging under the brand name "Pepperidge Farm" and sold or intended to be sold to retail stores as fresh (i.e. not preserved or stale), first quality (i.e. not Seconds) merchandise and does not include (1) any of such products sold, or intended to be sold to retail stores, frozen, refrigerated, canned, or otherwise preserved, (2) any of such products sold, or intended to be sold, to retail stores in a raw or uncooked state, (3) any of such products sold, or intended to be sold, to retail stores in bulk for resale by such retail stores at an in-store bakery or at a food-service counter or food-service section located within such retail store, (4) Stale Products, (5) Seconds, (6) merchandise of others containing Consigned Products as components, (7) any of such products packaged or wrapped in food-service or other non-retail packaging or (8) any of such products packaged, wrapped or sold under any brand name other than "Pepperidge Farm."

(e) STALE PRODUCTS —— refers to Consigned Products whose shelf life has expired, as determined by Bakery's stale policy existing from time to time.

(f) SECONDS —— refers to Consigned Products which do not meet the high standards required by Bakery for distribution in the ordinary manner and thus are deemed by Bakery, in its sole discretion, to be unsuitable for that purpose.

(g) DISTRIBUTION OR DISTRIBUTE —— refers to the sale and delivery of Consigned Products to retail stores within the Territory and to such hotels, restaurants, etc., as may be authorized by Bakery per Paragraph 9.

(h) BULLETIN PRICES —— refers to the prices for Consigned Products charged by Bakery and published from time to time.

(i) CHAIN —— refers to any person, firm, corporation or other legal entity that owns or operates three or more retail stores.

(j) DISTRIBUTION – refers to the distribution rights described in, and established under, this Agreement.

(k) GUARANTOR —— refers to the guarantor of Consignee's duties and obligations under this Agreement identified on the cover page hereof.

## TERMS

1. EXCLUSIVE OF DISTRIBUTORSHIP. Consignee will have the exclusive right to distribute Consigned Products to retail stores within the Territory, and Bakery will not sell or deliver or authorize any others to sell or deliver Consigned Products to retail stores (except for the in-store bakeries, food-service counters and food-service sections located in retail stores) within the Territory except in connection with temporary sales programs and except for sales to direct customers pursuant to orders solicited by Consignee under Paragraph 3 (b); provided, however, that Bakery will have the exclusive right to distribute Consigned Products to retail facilities owned or operated by Bakery or by any corporation controlled by Bakery. The terms of this Paragraph are subject, however, to the terms of Paragraphs 6, 7, and 9.

2. QUANTITIES CONSIGNED. Bakery will consign and deliver to Consignee at such locations as shall, from time to time, be designated by Bakery, and Consignee will accept sufficient quantities of Consigned Products to maintain at all times, an adequate and fresh supply thereof in all retail stores in the Territory which request such products and whose accounts are not demonstrably unprofitable; provided, however, Bakery reserves the right to allocate its products as nearly proportionately as practicable if the overall demand for its products exceeds its production. Consignee shall hold and care for all Consigned Products as the sole and exclusive property of Bakery. Title to all Consigned Products shall be vested in, subject to, and under the control of Bakery until delivered by Consignee to a purchaser. Consignee shall not encumber or grant any security interest in or lien on, or by action or inaction cause or allow any encumbrance, security interest or lien to be imposed upon, the Consigned Products.

3. PROCEEDS AND RECORDS OF SALE.

(a) Except as provided in subparagraph (b), Consigned Products shall be consigned to Consignee at Bulletin Prices, less the percentage specified in Schedule B, for sale and delivery to retail stores at such prices as Consignee may determine.

(b) Bakery may bill directly any Chains and military commissaries that have requested such direct billing or that request it in the future. Such directly billed stores in the Territory will be direct customers of Bakery, and Consignee will solicit sales from them and receive product for delivery to them on Bakery's behalf at Bulletin Prices. Bakery assumes all credit risks with respect to Chains and military commissaries which receive such direct billing. The funds owed by such chains and military commissaries as a result of the Consigned Products delivered are accounts receivable of, and debts payable to, Bakery and are not the property of Consignee. Consignee shall have the exclusive right to perform the service of delivery of Consigned Products to such customers of Bakery and Bakery shall not effect such delivery except through Consignee, subject to the provisions of Paragraphs 1, 6, 7, and 9. For the performance of its services of solicitation and delivery under this subparagraph (b), Consignee, if it shall have made prompt and timely delivery of all charge tickets as required by subparagraph (d) (2), shall be paid a percentage of net proceeds payable to Bakery by the direct billing customers, such percentage to be calculated at the rate specified in Schedule B.

(c) Bakery may from time to time extend credit to Consignee for Consigned Products to be sold to retail stores on credit extended by Consignee; provided Bakery has approved in advance the stores to receive such credit and the amount and terms thereof. Notwithstanding the foregoing, any credit extended by Consignee shall be at Consignee's risk.

(d) (1) Consignee shall pay promptly each week on the day specified by Bakery for all Consigned Products sold and delivered by Consignee during the preceding week, less any amounts which would be otherwise due on such sales as to which Bakery

CA01CORP

2

shall have extended credit to Consignee under (c) above, plus any amounts becoming due during such week under the terms of credit extended during any previous week.

(2) Consignee shall promptly deliver to Bakery on such days as Bakery may specify all charge tickets for all deliveries of Consigned Products to direct customers of Bakery for direct billing by Bakery.

(e)     Consignee will keep such records of Consigned Products received and sales and deliveries made as Bakery may from time to time reasonably request; Bakery may inspect such records and Consigned Products at such times as Bakery may select. Without limiting the generality of the foregoing, Consignee agrees that Bakery may take physical inventory of Consigned Products in Consignee's possession whenever and as often as Bakery deems advisable and that Consignee will keep such records of its operation and will furnish Bakery such copies thereof as Bakery may reasonably require.

4.     DISTRIBUTION EFFORTS. Consignee will use its best efforts to realize the full sales potential of the Territory for Consigned Products. To this end, Consignee will (a) actively solicit all retail stores in the Territory whose accounts can be profitably handled, (b) maintain at all times an adequate and fresh supply of Consigned Products in all such retail stores, (c) provide distribution service to all such retail stores on such days of the week (including weekends), at such intervals and with such frequency as is necessary to realize the full sales potential thereof and to maintain an adequate and fresh supply of Consigned Products therein, (d) make available to all such retail stores all varieties of authorized Consigned Products unless it is demonstrably unprofitable to do so, (e) cooperate with Bakery in the effective utilization of Bakery's advertising, sales promotion and space merchandising programs and (f) keep fully informed of Bakery's recommended policies and methods for increasing sales and improving distribution service. Consignee may sell or distribute other products, not competitive with Consigned Products, so long as such sale or distribution does not otherwise violate any terms or conditions of this Agreement or interfere with Consignee's performance of its obligations under the terms of this Agreement. Bakery may, from time to time, establish reasonable sales and/or distribution goals for Consignee and this Distributorship. Consignee shall either meet or exceed such goals.

5.     DISTRIBUTION SERVICE AND FACILITIES. Consignee will maintain efficient distribution service throughout the Territory in keeping with the established reputation of Bakery and the high quality of its products. To this end, Consignee will (a) provide adequate equipment and, if not otherwise provided by Bakery, facilities for the receipt, handling and delivery of Consigned Products and the accounting, inventory and billing thereof, including, without limitation, such computer and/or other systems as may be necessary or appropriate therefor and (b) comply with all laws and regulations relating either directly or indirectly to the operation or ownership of the Distributorship, including, without limitation, motor vehicle, food, drug, health and sanitary laws and regulations and (c) maintain such route books and other records as are required by Bakery from time to time. Pursuant to the foregoing, Consignee shall provide, and shall maintain in good and proper working condition and appearance, a delivery truck(s), computer and such other equipment as, from time to time, shall be necessary for the operation of the Distributorship. Consignee shall maintain the general appearance and condition of such truck(s), computer and other equipment, as well as the appearance and deportment of all Consignee's officers, directors, employees, agents, representatives and helpers, in accordance with the established reputation of Bakery and the high quality of its products.

6.     EMERGENCY SERVICE. If, by reason of illness or vacation or any other cause, Consignee shall be unable at any time to provide or maintain the efficient distribution service contemplated by this Agreement, Consignee will make other suitable arrangements at its own expense for the provision and/or maintenance of such service; but if Consignee is unable or fails to do so, Bakery is authorized in its discretion to provide and/or maintain such service as Consignee's agent and at Consignee's expense and risk. Upon the request of Consignee, Bakery will endeavor in any emergency to provide and/or maintain such service as Consignee's agent and at Consignee's expense and risk.

7.     FAILURE TO SERVICE PARTICULAR STORES. If Consignee fails for any reason to provide or maintain satisfactory distribution service to any segment of the Territory or to any retail store within the Territory, and such failure is not remedied within five days after written notice thereof from Bakery, Bakery, in addition to the other remedies available to it hereunder, may make other arrangements, on either a permanent or temporary basis, in the discretion of Bakery, for the service of such store or segment of the Territory, as the case may be. If such arrangements for service are made on a permanent basis, the retail store or segment of the Territory involved shall be deemed to be no longer included in the Territory and Schedule A shall be modified accordingly, all without compensation or remuneration to Consignee.

8.     CHAIN STORE ACCOUNTS. If any Chain requires that authorization for the distribution of Consigned Products to the Chain's retail stores in the Territory shall be obtained through a central or district office located outside of the Territory, or only in conjunction with the distribution of Consigned Products to its retail stores in other territories, Bakery will cooperate with Consignee in procuring such authorization. If any Chain refuses to pay or to permit store managers to pay any Consignee directly for Consigned Products and, instead, requires the submission of a consolidated bill to a central or district office of the Chain, Bakery will handle the billing, and the terms of Paragraph 3 (b) shall apply.

9.     PROHIBITED SALES AND DELIVERIES. Consignee will not sell or deliver any Consigned Products, or any products listed in Schedule B, directly to consumers or to any other purchasers except retail stores (exclusive of the in-store bakeries, food-service counters and food-service sections located in such retail stores) within the Territory and such hotels, restaurants, clubs and similar organizations within the Territory as Bakery may authorize in writing. Also, Consignee will not, without like authorization, make deliveries of Consigned Products to any Chain via a central or district warehouse or in any manner other than directly to its retail stores. If, despite the good faith efforts of Consignee and Bakery to obtain permission from any Chain to make deliveries directly to its retail stores, such Chain refuses to handle Consigned Products except via warehouse deliveries, Bakery shall have the right in its discretion to sell and deliver the Consigned Products directly to such chain for its own account via warehouse deliveries as long as such refusal remains in effect. In addition, Consignee shall, if requested to do so in writing by Bakery, on a non-exclusive basis and for the period

of time set forth in such written request, distribute products listed in Schedule B (as modified from time to time pursuant to Paragraph 10) to in-store bakeries and to food-service counters and food-service sections located in retail stores in the Territory.

10.   MODIFICATION OF LIST PRODUCTS.  The list of Consigned Products set forth in Schedule B hereto may be modified or changed by Bakery from time to time by (a) adding such other products as it may deem advisable among those which it now or hereafter produces, (b) withdrawing within any sales district or other geographic area any Consigned Products (whether originally listed or subsequently added) which it discontinues producing or which it discontinues selling in such sales district or other geographic area or (c) adding or withdrawing at any time with or without notice and for any reason any product designated as "test product," "for market test" or the like.  In addition, Bakery shall have the right from time to time to change the ingredients, the method of production or the labeling or packaging of any Consigned Products.  In addition, if Consignee fails to comply with the terms and conditions of this Agreement with respect to any Consigned Product or Consigned Products, then Bakery may, in addition to any other remedies available to it hereunder, if such failure shall continue for a period of thirty days after written notice thereof from Bakery, without compensation or remuneration to Consignee, delete such Consigned Product or Consigned Products from Schedule B, in which event Consignee's right to distribute such deleted Consigned Products under the terms of this Agreement shall immediately terminate.

11.   SALES DATA.  Consignee will furnish to Bakery such sales data as it may reasonably require for the planning of its production schedules, the expansion of its operations and the planning and conduct of sales promotion programs.

12.   TRADE NAME, ETC.  Consignee may use Bakery's trade name, trademark and distinguishing colors on its truck(s) and other equipment and supplies; provided, however, that (a) Bakery's trade name may not be used as a part of any business name or trade name of Consignee without the written consent of Bakery or in any other way which will tend to confuse the separate identities of Bakery and Consignee, and (b) Bakery shall have the right at any time to revoke the permission granted in this Paragraph if, in its opinion, the general appearance of Consignee's truck(s) or other equipment or the general appearance or deportment of all Consignee's officers, directors, employees, agents, representatives and helpers, shall fall below standards in keeping with the established reputation of Bakery and the high quality of its products.

13.   INSURANCE AND INDEMNIFICATION.  Consignee shall, at Consignee's expense, maintain adequate public liability, property damage and, where appropriate, workers' compensation insurance to protect Bakery and Consignee against any and all claims of personal injury, death or property damage, other than damage to Consigned Products in possession of Consignee.  Such insurance shall be in such amounts and have such limits as shall be acceptable to Bakery or required by the retail stores in the Territory, whichever is greater, shall name Baker as an additional insured thereunder and shall provide that the insurance shall not be terminated without at least fifteen (15) days' prior written notice to Bakery.  Consignee shall, prior to the date of execution of this Agreement, and at least annually thereafter, provide Bakery with insurance certificates evidencing such coverage.  If Consignee fails to obtain or to maintain the insurance coverage required by this Paragraph, Bakery may, at its option, purchase such insurance coverage on behalf of Consignee, and Consignee shall reimburse Bakery in full for the cost thereof.  Consignee covenants and agrees to indemnify, defend and save Bakery harmless from and against any and all claims relating to payroll, unemployment compensation, employee benefits, personal injury, death, or property damage (other than damage to Consigned Products in the possession of Consignee) caused or alleged to have been caused directly or indirectly by or as a result of the actions of Consignee or any of its officers, directors, employees, agents, representatives or helpers, or by or as a result of the operation of the Distributorship or any vehicle or equipment owned or used by Consignee or any of its officers, directors, employees, agents, representatives or helpers, and any and all losses, damages, liabilities and expenses (including attorney's fees) incurred by Bakery as a result thereof.  Anything in this Agreement to the contrary notwithstanding, this indemnification provision shall survive any termination of this Agreement.

14.   NON-PERFORMANCE FOR REASONS BEYOND CONTROL.  Neither Bakery nor Consignee shall be liable for any failure to comply with the terms of this Agreement if such failure shall have been caused, primarily by fire, labor dispute, strike, war, insurrection, governmental restriction or any other cause beyond the control of the party so failing.

15.   INDEPENDENT CONTRACTOR.  Consignee is a self-employed independent contractor, not an agent or employee of Bakery, and has no authority other than to distribute products consigned hereunder and to solicit orders for and make deliveries of Consigned Products in the case of direct sales of Bakery under Paragraph 3 (b); express or implied, to do or perform any act or thing or to make any warranty or representation or promise or commitment of any character which will be binding upon Bakery or for which it will be responsible, and Consignee will refrain from any conduct inconsistent with the terms of this Paragraph 15.  Consignee may, at its own expense and risk, employ such persons as Consignee shall deem appropriate to assist in the performance of Consignee's obligations under the terms of this Agreement, and Consignee shall be responsible for the hiring, firing, training and supervision of, and all remuneration and benefits for, any person so employed.  The independent contractor relationship between Bakery and Consignee is an essential element of this Agreement.  The discount percentage and commission rate described in Paragraph 3 and the percentages established pursuant to Schedule B or any similar schedule under this Agreement are based in substantial part on such independent contractor relationship and the understanding that the Bakery is not obligated to pay any FICA, income or similar tax or withholding for or on behalf of the Consignee.

16.   LIEN OF BAKERY ON DISTRIBUTORSHIP.  Bakery shall have a first lien on the Distributorship and all proceeds of the Distributorship as security for all indebtedness of Consignee to Bakery at any time outstanding.  Any sale, transfer or assignment of the Distributorship (invalid per Paragraph 18 without the written approval of Bakery) shall be subject to such lien unless such lien shall be expressly released by Bakery in writing.  Consignee shall not, without the prior written consent of Bakery, encumber or grant any security interest in or lien upon, or by its action or inaction cause or allow any encumbrance, security interest or lien to be imposed upon this Distributorship, other than the lien imposed by this Paragraph 16; and it is expressly agreed that Bakery shall have no obligation whatsoever to consent to any such encumbrance, security interest or lien unless and until the proposed lienholder shall have agreed in writing to subordinate its lien, encumbrance or security interest to the lien created by this Paragraph 16.  Bakery's consent to any such

encumbrance, security interest or lien which has been so subordinated to the lien of Bakery es ablished pursuant to this Paragraph 16 shall not be unreasonably withheld.

17. **RIGHT OF FIRST REFUSAL.** Consignee must give Bakery written notice of each proposed sale, conveyance or transfer (hereinafter "proposed sale") of all or any portion of this Distributorship, which notice shall identify the prospective purchaser and the terms and conditions of the proposed sale. Such notice of proposed sale from Consignee shall be deemed to be an irrevocable offer to sell the Distributorship, or the portion thereof described in such notice of proposed sale, to Bakery on the terms and conditions set forth therein. Bakery shall have the right, but not the obligation, to accept such offer by giving Consignee written notice of acceptance within thirty days of the later of (i) Bakery's receipt of Consignee's written notice of proposed sale or (ii) Bakery's receipt of the full and complete application of the prospective purchaser, including all requested financial and credit information (which right is hereinafter referred to as the "Right of First Refusal"). Such notice of acceptance from Bakery shall be deemed to be an acceptance of Consignee's offer of sale, and the sale of the Distributorship, or the portion thereof offered for sale, by Consignee to Bakery, on the terms set forth in the notice of proposed sale, shall be consummated at a closing to be held within thirty days of such notice of acceptance. Bakery's failure or refusal to exercise any Right of First Refusal hereunder does not constitute, and shall not be deemed to be, an approval by Bakery of the proposed sale or the proposed purchaser. Any change in the identity of the proposed purchaser or in any terms of any proposed sale from those identified in any notice from Consignee to Bakery hereunder shall be deemed to be a new proposed sale with respect to which Consignee must give Bakery a new notice and a new Right of First Refusal in accordance with the terms of this Paragraph 17.

18. **SALE OF DISTRIBUTORSHIP.** The Distributorship may not be sold, conveyed or transferred by Consignee in whole or in part without the prior written approval of Bakery. Bakery will grant such approval with respect to a proposed sale if (i) Consignee has given Bakery proper and timely notice of such proposed sale as required by Paragraph 17, (ii) Bakery has not exercised, or has in writing refused to exercise, its Right of First Refusal with respect to such proposed sale and (iii) the purchaser meets the requirements of Bakery as to character, ability, financial responsibility, business acumen, adequate facilities and involvement in the business; provided, however, that any such approval shall be conditioned upon Consignee's payment in full, prior to such sale, of all Consignee's indebtedness to Bakery. In addition, where such proposed sale involves the division of the Territory or the sale of only a portion of the Distributorship, such proposed sale is subject to, and may not be effected without, Bakery's prior written approval of the division of Territory sought to be effected thereby. Bakery will notify Consignee with reasonable promptness of its approval or disapproval of any proposed sale and, if applicable, of any proposed division of the Territory. Any transaction or instrument which purports to constitute an assignment of this Agreement or a sale, transfer or assignment of the Distributorship, as a whole or in part, without such written approval shall be void. Any transaction or instrument which purports to constitute an assignment of this Agreement or a sale, transfer or assignment of this Distributorship, as a whole or in part, on terms that are different from those set forth in, or to a party different from the proposed purchaser identified in, the notice of proposed sale given Bakery pursuant to the terms of Paragraph 17 shall be void. Any valid sale of this Distributorship as a whole shall operate to release Consignee from all obligations to Bakery hereunder except the obligation to pay in full any adverse balance in its account with Bakery, and Bakery shall have the right in its discretion to require the purchaser to accept a new consignment agreement in substantially the same form, in lieu of continuing this Agreement in effect, in whole or in part, on an assigned basis.

19. **TERMINATION OF CONSIGNMENT AGREEMENT FOR CAUSE.** Bakery, in addition to all other remedies available to it at law or equity and to the extent permitted by law, shall have the right in its discretion to terminate this Agreement at any time, upon written notice to Consignee, for any of the following causes:

(a) failure of Consignee adequately to realize the sales potential of the Territory and Consignee's failure to make satisfactory improvement within thirty days after notice of inadequacy from Bakery;

(b) failure of Consignee to the perform or comply with any material term or provision of this Agreement and the continuance of such failure for seven days after written notice thereof from Bakery;

(c) failure of Consignee to maintain the general appearance and condition of its truck(s) or other equipment or the general appearance or deportment or that of any of its officers, directors, employees, agents, representatives or helpers, in accordance with standards in keeping with the established reputation of Bakery and the high quality of its products and the continuance of such failure for more than five days after written notice thereof from Bakery;

(d) any repeated failure of the type described in any of subparagraphs (a) through (c) above, even though a previous failure or failures may have been corrected after notice;

(e) any dishonesty of Guarantor or Consignee or any of its officers, directors, employees, agents, representatives or helpers in his/her or its dealings with Bakery or with others in connection with Consignee's distribution services under this Agreement;

(f) any actions, activities or practices of Guarantor or Consignee or any of its officers, directors, employees, agents, representatives or helpers which either do, or in the opinion of Bakery are likely to, materially damage the reputation of Bakery and/or Bakery's relations or reputation with consumers, retail stores or any other purchaser of Consigned Products;

(g) Guarantor's or Consignee's insolvency or admission in writing of his/her or its inability to pay his/her or its debts as they mature;

(h) the filing of voluntary bankruptcy petition by Guarantor or Consignee or his/her or its failure to vacate an involuntary bankruptcy petition within sixty days after date of filing;

(i) failure of Guarantor or Consignee to vacate the appointment of a receiver or trustee of Guarantor's or Consignee's business or assets within sixty days after the date of appointment; or

(j) a general assignment by Guarantor or Consignee for the benefit of his/her or its creditors.

CA01CO.AP                                          5

(k)     the failure of the Guarantor to be, and at all times remain, the owner, free and clear of all liens, encumbrances and pledges, of a majority of all shares or membership interests of each class of securities or membership interests issued and outstanding by the Consignee, including, without limitation a majority of all voting securities, common stock or otherwise, of the Consignee. Termination of this Agreement and the Distributorship pursuant to this Paragraph shall operate to release all rights and obligations hereunder of both Bakery and Consignee except Consignee's right to receive compensation therefor in accordance with the established business practices of Bakery, and each party's right to receive any favorable balances and obligation to pay any adverse balances.

20.   BAKERY'S OPTION TO BUY DISTRIBUTORSHIP.   Bakery shall have the right in its discretion to purchase all or any portion of the Distributorship at any time upon written notice to Consignee.   Bakery shall become the owner of the Distributorship, or the portion being purchased, on the date specified in the notice, whether or not a final purchase price has been agreed upon or determined, as provided below.  Bakery may begin operating the Distributorship, or the portion being purchased, for its own account on such date. If Bakery elects to purchase all or any portion of the Distributorship pursuant to this Paragraph, it will pay to Consignee a sum equal to (a) the fair market value of the Distributorship, or the portion thereof being purchased, as the case may be, on the date set forth in the written notice plus (b) 25% of such fair market value, to be determined either by agreement between Bakery and Consignee or, if they shall be unable to agree, by three arbitrators, one of whom shall be chosen by Bakery and one by Consignee and the third by the two first chosen.  Each party to such arbitration shall pay all fees and expenses incurred by it in connection with such arbitration, including, without limitation, the fees and expenses of the arbitrator chosen by it, and the fees and expenses of the third arbitrator shall be shared equally by Consignee and Bakery.  The determination of fair market value by a majority of the three arbitrators shall be final and binding upon both Bakery and Consignee for the purpose of this Paragraph.  Notice of purchase pursuant to this Paragraph shall operate to release all rights and obligations hereunder of both Bakery and Consignee except (a) the right to receive any favorable balances and the obligation to pay any adverse balances and (b) the rights and obligations with respect to payment and arbitration stated in this Paragraph.

21.   TERMINATION OF CONSIGNMENT AGREEMENT BY CONSIGNEE.  Consignee shall have the right in its discretion to terminate this Agreement at any time upon thirty days written notice to Bakery.  Termination pursuant to this Paragraph shall operate to release all rights and obligations hereunder of both Bakery and Consignee except the right to receive any favorable balances and the obligation to pay any adverse balances.

22.   DEATH OF GUARANTOR; DISSOLUTION OF CONSIGNEE.

(a)     In the case of the Guarantor's death, all the terms of this Agreement (see particularly Paragraph 6) shall continue in effect during the next 90 days.  If Consignee shall not have sold this distributorship pursuant to Paragraph 18 within such 90 day period, all rights and obligations hereunder of Bakery and Consignee shall terminate at the expiration of such period except (i) the right to receive any favorable balances and the obligation to pay any adverse balances and (ii) the right of Consignee to receive and the obligation of Bakery to pay to Consignee the entire proceeds (subject, however to Bakery's lien per Paragraph 16) of any sale of this Distributorship (in whole or in part) made or contracted to be made by Bakery within the next 90 days, provided, however, that if Bakery shall have provided distribution services within all or any portion of the territory during all or any portion of the period from the expiration of the first 90 day period to the date of such sale, Bakery may deduct from the proceeds of sale any excess of its expense over income in providing such services.  If Bakery provides emergency distribution service under Paragraph 6 during all or any portion of the first 90 day period, any excess of its income over expense in providing such service shall be paid to Consignee (subject to any right of setoff that may exist), but Consignee shall not be liable to Bakery or any excess of its expense over income in providing such services, although any such excess of expense may be deducted from the proceeds of sale.

(b)     In the event that the corporate existence of the Consignee shall be liquidated, dissolved or in any other way terminated or fail to remain in good standing with the state in which it is incorporated, or in the event that the Consignee shall be merged with or acquired by any other person or entity or a controlling interest in the Consignee shall be acquired by any person or entity other than Consignee, then this Agreement, and all rights and obligations of Bakery and Consignee hereunder, shall terminate immediately except (a) the right to receive any favorable balances and the obligation to pay any adverse balances and (b) the right of Consignee to receive and the obligation of Bakery to pay to Consignee the entire proceeds (subject, however, to Bakery's lien per Paragraph 16) of any sale of this Distributorship (in whole or in part) made or contracted to be made by Bakery within the next 90 days, provided however, that if Bakery shall have provided distribution service within all or any portion of the territory during all or any portion of the period from such termination to the date of such sale, Bakery may deduct from the proceeds of sale any excess of its expense over income in providing such services.

23.   TERMINATION OF CONSIGNMENT AGREEMENT WITHOUT CAUSE.  Bakery shall have the right in its discretion to terminate this Agreement at any time without cause upon written notice to the Consignee.  Upon termination pursuant to this Paragraph the Bakery will pay to the Consignee a sum equal to (a) the fair market value of the Distributorship on the termination date plus (b) 25% of such fair market value, to be determined either by agreement between Bakery and Consignee or, if they shall be unable to agree, by three arbitrators, one of whom shall be chosen by Bakery and one by Consignee and the third by the two first chosen.  Each party to such arbitration shall pay all fees and expenses incurred by it in connection with such arbitration, including, without limitation, the fees and expenses of the arbitrator chosen by it, and the fees and expenses of the third arbitrator shall be shared equally by Consignee and Bakery.  The determination of fair market value by a majority of the three arbitrators shall be final and binding upon both Bakery and Consignee for the purpose of this Paragraph.  Termination pursuant to this Paragraph shall operate to release all rights and obligations hereunder of both Bakery and Consignee except (i) the right to receive any favorable balances and the obligation to pay any adverse balances and (ii) the rights and obligations with respect to payment and arbitration stated in this Paragraph.  This Paragraph, and the rights and remedies set forth in this Paragraph, shall constitute the Consignee's sole remedy in the event of a termination of this Agreement without cause.

24.   WITHHOLDING PRODUCT.  Upon Consignee's failure to fulfill any of its obligations under this Agreement or, upon the occurrence of any of the events referred to in Paragraph 19, Bakery shall have the right, without thereby terminating this Agreement,

CADBCORP

6

immediately to discontinue shipment of Consigned Products to Consignee until such time as Consignee shall have completely remedied such failure or occurrence, and no such discontinuance shall be, or be deemed to be, a waiver by Bakery of any of its rights or remedies under this Agreement or at law or in equity, including without limitation, the right to terminate this Agreement for the same failure or occurrence. Bakery's rights and remedies under this Paragraph shall be in addition to, and may be exercised concurrently with, all other remedies available to it under this Agreement or at law or in equity.

25. NOTICES. All notices which are required to or which may be given under the terms hereof shall be in writing and shall be deemed given when deposited in the United States mails, postage prepaid, and addressed to the other party at the address designated for such party on the cover page hereof. Either party may change such address by giving notice of a new address.

26. DURATION OF CONSIGNMENT AGREEMENT. This Agreement shall continue in effect until terminated in the manner provided in Paragraphs 19, 21, 22 or 23, until Bakery has given Consignee written notice of Bakery's election to purchase all or any portion of the Distributorship, as provided in Paragraph 20, or until Bakery has purchased all or any portion of the Distributorship pursuant to the Right of First Refusal, as provided in Paragraph 17. In the event that Bakery has given Consignee written notice of its election to purchase a portion of the Distributorship pursuant to the Right of First Refusal as provided in Paragraph 17, the parties shall promptly enter into a new Consignment Agreement in substantially the form hereof, except for the modification of the Description of Territory in Schedule A to reflect such purchase.

27. GENERAL. The terms of this Agreement shall be construed so as to carry into effect its true intent and meaning, and any ambiguities shall be construed and any inconsistencies shall be reconciled accordingly. Any consent, permission, authorization or waiver given hereunder with respect to any continuing act or condition may be subsequently revoked in the same manner as given. Except as expressly set forth herein, this Agreement may not be assigned by Consignee.

28. ENTIRETY OF CONSIGNMENT AGREEMENT. This Agreement represents the entire agreement between Bakery and Consignee and supersedes any and all prior agreements or understandings between Bakery and Consignee, whether written or oral, regarding distribution of Consigned Products. This Agreement may not be amended orally or by custom or conduct but only by a writing signed by both Bakery and Consignee.

Dated at Norwalk, Connecticut October 8, 2018

This Consignment Agreement is
Accepted upon the terms stated above.

NOBODY OWNS ME, LLC

By: _Coleman McMillan_____
    Coleman McMillan
Its: _President_____

PEPPERIDGE FARM, INCORPORATED

By: _____
    Erin Pulito
Its: Director, Distributor & Market Development

# SCHEDULE A

## DESCRIPTION OF TERRITORY

In the State of New Jersey, and all that territory more fully described as follows:

NOTE: Retail Stores "fronting" on any thoroughfare or boundary described herein (unless specified otherwise) are deemed to belong to this distributorship territory. The term "fronting" as used in this Description of Territory shall have the same meaning as "facing". Unless specified otherwise, a Retail Store is deemed to be "fronting" the road on which its primary mailing address is located.

Beginning at a point formed by the intersection of NJ Route 3 and the Passaic River;
thence west on NJ Route 3 to the intersection with Passaic Avenue;
thence north on Passaic Avenue to the intersection with the Clifton/Passaic town line;
thence northwest on the Clifton/Passaic town line to the intersection with Van Houten Avenue;
thence northwest on Van Houten Avenue (excluding all route customers) to the junction with Valley Road;
thence south on Valley Road (excluding all route customers) to the intersection with US Route 46;
thence west on US Route 46 (excluding all route customers) to the junction with the West Paterson/Clifton town line;
thence northeast on the West Paterson/Clifton town line to the junction with the Paterson town line;
thence northwest on the West Paterson/Paterson town line to the junction with the Passaic River;
thence northeast on the Passaic River to the intersection with Interstate 80;
thence east on Interstate 80 (excluding route customers on the northerly side) to the intersection with the Saddle River;
thence south on the Saddle River to the intersection with US Route 46;
thence west on US Route 46 to the intersection with the Hasbrouck Heights/Teterboro town line;
thence south on the Hasbrouck Heights/Teterboro town line to the intersection with Franklin Avenue;
thence west on Franklin Avenue to the intersection with Terrace Avenue;
thence southwest on Terrace Avenue (excluding all route customers on westerly side) to the junction with Lincoln Street;
thence northwest on Lincoln Street (excluding all route customers on the southerly side) to the intersection with Tenth Avenue;
thence south on Tenth Street (excluding all route customers on the easterly side) to the intersection with Wood Ridge Avenue;
thence northwest on Wood Ridge Avenue (excluding all route customers on the southerly side) to the junction with the Wood Ridge/Wallington town line [AKA – NJ Transit – Bergen Line railroad tracks];
thence north on the Wood Ridge/Wallington town line [AKA – NJ Transit – Bergen Line railroad tracks] to the intersection with Main Street;
thence northeast on Main Street (excluding all route customers on the westerly side) to the intersection with the Lodi/Wood Ridge/South Hackensack town line;
thence west on the Lodi/South Hackensack, Lodi/Garfield town lines to the junction with Passaic Street & Fredric Street;
thence northwest on Fredric Street to the intersection with Harrison Avenue;
thence northeast on Harrison Avenue to the junction with Northview Terrace;
thence north on Northview Terrace (excluding route customers) to the junction with Outwater Lane;

CA01CORP

thence west on Outwater Lane (excluding route customers on the southerly side) to the intersection with Midland Avenue;
thence north on Midland Avenue (excluding route customers on the westerly side) to the junction with Lanza Avenue;
thence west on Lanza Avenue (excluding route customers) to the junction with the Passaic River;
thence south on the Passaic River to the intersection with NJ Route 3;
the point of beginning.

Notwithstanding anything in this Consignment Agreement or the Schedule A, Description of Territory to the contrary, Distributor shall have no right whatsoever at any time to distribute Consigned Products to any retail stores that are, have bee, or in the future be deemed to be Club Stores within the Territory described herein. For the purposes of this Consignment Agreement, the term "Club Stores" shall mean that class or type of retail store that is commonly (though not necessarily) dedicated to large sizes and bulk sales to consumers who may be required to pay a membership fee to shop therein (e.g. Costco, Sam's Club, B.J.'s, etc.). It is agreed and understood by Distributor that Bakery shall have the exclusive right to distribute Consigned Products to all Club Stores that have existed, currently exist or in the future may exist in the Territory.

Dated: October 8, 2018

APPROVED:

APPROVED:

NOBODY OWNS ME, LLC

PEPPERIDGE FARM, INCORPORATED

By: _Coleman McMillan_
    Coleman McMillan

By: _Erin Pulito_
    Erin Pulito

Its: President

Its: Director, Distributor & Market Development

# SCHEDULE B

## LIST OF CONSIGNED PRODUCTS
### (SUBJECT TO MODIFICATION PER PARAGRAPH 10)

SCHEDULE B
LIST OF CONSIGNED PRODUCTS
(SUBJECT TO MODIFICATION PER PARAGRAPH 10)

**Milano**
7412 Milano
7435 Orange Milano
7472 Double Chocolate Milano
7481 Raspberry Milano
7567 Milk Chocolate Milano
7847 Mint Milano
8735 Amaretto Milano
8736 Black & White Milano
9038 Chocolate Raspberry Milano
9043 Chocolate Mint Milano

**Entertaining - Boxed Cookies**
7233 Distinctive Selection Large (18 ct)
7521 Golden Orchard Assortment
7704 Ginger Family (18ct)
7912 9 Cup Assortment Holiday Shipper (24 CT)
8310 Chocolate Collection

**Entertaining – Pirouettes**
8781 Mint Chocolate Pirouette
8782 Chocolate Fudge Pirouette
8783 Chocolate Hazelnut Pirouette
8784 French Vanilla Pirouette

**Chocolate Drenched**
9006 Milk Chocolate Drenched Milano
9007 Dark Chocolate Drenched Milano
9008 Chocolate Drenched Mint Milano
9009 Chocolate Drenched Milano Shipper

**Gifting**
9021 Holiday Gift Box

**Other Distinctive Bag**
7410 Bordeaux
7419 Geneva
7420 Brussels Mint
7946 Brussels
7952 Butter Chessmen
8908 Tahiti
9042 Chocolate Chessman

**PF Chocolate Chunk – Crispy**
7522 Tahoe
7708 Chesapeake
7712 Sausalito

**Single Serve Goldfish**
7574 Cinnamon GF Grahams SS (Each Pouch)
7760 Cheddar Cheese GF, SS (Each Pouch)
7867 Cheddar Cheese Goldfish 2 oz
8127 Goldfish Colors Carton 2 oz.
8799 Cheddar GF 2.6oz Grab Bag
8800 GF Colors 2.25oz Grab Bag
8801 FB Cheddar 2.25oz Grab Bag
9000 Variety Pack (Cheddar GF/ Pretzel GF/ Minn Nantucket 9ct)
9001 Goldfish Colors 9ct Multipack (1.1oz Pouch)
9002 Flavor Blasted Xtra Cheddar - 9ct
9003 Cheddar Cheese GF, SS 9ct-1.25 oz
9133 12ct Whole Grain Cheddar GF Multi-pack
9137 9ct Whole Grain Cheddar GF Multi-pack

**Baked Naturals**
8932 Wheat Crisps - Zesty Tomato Herb
8934 Wheat Crisps - Toasted Wheat
8942 Pretzel Thins - Simply Pretzel
8943 Snack Sticks - Artisan Cheese
8947 Snack Sticks - Toasted Sesame
8948 Pretzel Thins - Savory Cheddar
9215 Baked Naturals Pre-packed Shipper

**Snack Sticks**
7802 Pumpernickel
7803 Sesame
7805 Three Cheese

**Distinctive Crackers**
7144 Holiday Quartet DC Shipper (24 CT)
7447 Quartet Cracker Asst.
7477 Golden Butter
7487 Hearty Wheat
8985 Classic Water

**Bag Goldfish**
8089 Holiday - Red & Green Goldfish
8539 Goldfish Colors
8546 Parmesan Cheese
8547 Cheddar Cheese
8550 Original
8554 Low Salt Cheddar
8560 Pizza
8561 Baby Cheddar
8562 Pretzel
8563 Bilingual Cheddar

7713 Nantucket
7860 Double Chocolate Nantucket
9193 Crispy Chocolate Chunk - White & Milk Chocolate

**PF Chocolate Chunk - Soft Baked**
7821 SB Chocolate Chunk – Nantucket
7869 SB Choc Macadamia – Sausalito
7884 SB Oatmeal Raisin - Santa Cruz
8203 SB Dark Chocolate Brownie – Captiva
8206 SB Caramel – Carmel
8469 SB Sugar Cookie
8470 SB Snickerdoodle
8899 SB Oatmeal
8900 SB Milk Chocolate
8901 SB Molasses
9192 SB Chocolate Chunk - White & Milk Chocolate

**Fruit Cookies**
7462 Verona Apricot Raspberry
7464 Verona Strawberry
9058 Verona Apple Caramel
9059 Verona Blueberry
9109 Montien Peach Tart
9110 Montien Apple Cinnamon Tart
9111 Montien Raspberry Tart
9177 Fruit Cookies Prepacked Shipper

**Old Fashioned/Homestyle**
7438 Sugar
7444 Shortbread
7445 Gingermen

**100 Calorie Pack Cookies**
8973 Butter Chessman 100 Calorie Pack
8975 Chocolate Chessman 100 Calorie Pack
8976 Chocolate Chunk 100 Calorie Pack

**Single Serve Cookies**
7515 Milano 2 Pk
7619 Sausalito
7668 Brussels 2Pk.
7695 Nantucket
7796 Milano 3 Pk. (Each Pouch)
7875 Milano 3 Pk, 9ct Tray (comprised of 7796)
7877 CCC Minis, 9ct tray
8797 Mini Chessman Grab Bag
8798 Mini Nantucket Grab Bag
8854 Dark Chocolate Brownie 2-pack
8855 Soft Baked Oatmeal Raisin 2-pack
8884 Milano 3pk. Grab Bag

8564 Calcium
8578 Whole Grain Cheddar GF
8930 Starfish Cheddar

**Flavor Blasted Goldfish**
8548 Flavor Blasted Xtra Cheddar GF
8551 Flavor Blasted Jalapeno OLeso GF
8552 Flavor Blasted Nothin' but Nacho GF
8553 Flavor Blasted Xplosive Pizza GF
8886 Flavor Blasted Blazin Buffalo GF

**Goldfish Box**
8172 Extra Cheddar Flavor Blasted Goldfish
8639 Goldfish Colors
8708 Cheddar GF

**Goldfish Box - 18 oz**
7579 18 oz Cheddar Cheese

**Goldfish Variety Packs**
7523 Goldfish On The Go Cheddar (Pouch)
7615 Goldfish On The Go Cheddar
7639 Goldfish On The Go Variety Pk
7650 Goldfish On The Go Variety Pk (Pouch)

**100 Calorie Pack Goldfish**
8745 Baby Wholegrain Cinnamon 100 Calorie Pack
8748 Baby FB Wholegrain Cheddar 100 Calorie Pack
8749 Baby Wholegrain Cheddar 100 Calorie Pack
8763 Baby Wholegrain Chocolate 100 Calorie Pack
8869 Pretzel 100 Calorie Pack

**Goldfish Novelty Packs**
8392 0.4oz Cheddar GF Pouches
8534 0.4oz pouches FBGF Extra Cheddar

For distribution of the foregoing products to direct billing customers of Bakery under Paragraph 3 (b) of this Agreement, Consignee will, subject to the terms o that Paragraph 3 (b) to be paid a percentage of the net proceeds of such sales payable to Bakery calculated at the rate of 20% of the published prices in effect from time to time for Consigned Products
CADICORP

A GUARANTY

IN CONSIDERATION of the execution and delivery of that certain Consignment Agreement by and between Nobody Owns Me, LLC ("Distributor") and Pepperidge Farm, Incorporated ("Pepperidge Farm") dated **October 8, 2018** (the "Agreement"), and for other good and valuable consideration, the receipt of which is acknowledged, the undersigned Guarantor hereby represents, warrants and agrees as follows:

1.      Guarantor is, and at all time hereafter shall remain, the owner, free and clear of all liens, security interests, and claims or rights of others, of a majority of all issued outstanding shares of each class of securities, common stock or otherwise, of the Distributor, including, without limitation, its voting securities (such securities owned by Guarantor being hereafter referred to as the "Securities").

2.      Guarantor shall not sell, assign, pledge, encumber or otherwise transfer all or any portion of the Securities to any person, firm, corporation or other entity without the prior written consent of Pepperidge Farm.

3.      Guarantor shall, and hereby does, guaranty the full, complete and timely performance by Distributor of each and every obligation of Distributor under the foregoing Agreement (each, an "Obligation").

4.      Guarantor waives: (a) notice of the acceptance by Pepperidge Farm, Incorporated, and its affiliates, successors and assigns (each, a "Beneficiary"); (b) notice of the existence or creation of non-payment or non-performance of all or any Obligations; (c) presentment, demand, notice of dishonor, protest and all other notices whatsoever; and (d) all diligence in collection or protection of or realization upon the Obligations or any thereof, any obligation hereunder, or any security for or guaranty of any of the foregoing. A Beneficiary may, from time to time, without notice to Guarantor, assign (collaterally or otherwise) or transfer any or all of the Obligations or any interest therein and each and every assignee or transferee of any of the Obligations shall be entitled to the benefits of this Guaranty.

5.      The obligations of Guarantor under this Guaranty shall be absolute, continuing and unconditional irrespective of any circumstance whatsoever which might constitute a legal or equitable discharge or defense of Guarantor, including, without limitation, (a) the genuineness, validity, regularity or enforceability of any of the Obligations; (b) any amendment, waiver or other modification of the Agreement; (c) the extension of the time for or waiver of, at any time or from time to time, without notice to the Guarantor, Distributor's performance of or compliance with any of its obligations under the Agreement; (d) any merger or consolidation of Distributor or the Guarantor into or with any other person; (e) any change in the ownership of any shares of capital stock of Distributor; (f) the liquidation, dissolution, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, arrangement, composition or readjustment of, or other similar proceedings affecting the status, existence, assets or obligations of, Distributor, or the disaffirmance with respect to Distributor of the Agreement in any such proceeding; or (g) any other actions, occurrences or circumstances whatsoever. This Guaranty is an absolute, present and continuing guaranty of payment and performance and not of collectability and is in no way conditional or contingent upon any attempt to collect from Distributor any unpaid amounts due or otherwise to enforce performance by Distributor.

IN WITNESS WHEREOF, the Guarantor has executed this Guaranty as of **October 8, 2018**

**NOBODY OWNS ME, LLC**

_____
Coleman McMillian

CADICORP

13

# Civil Case Information Statement

**Case Details: PASSAIC | Civil Part Docket# L-004049-21**

**Case Caption:** MCMILLAN COLEMAN VS PEPPERIDGE FARM INCO RPORATE

**Case Initiation Date:** 12/28/2021

**Attorney Name:** CHARLES J KOCHER

**Firm Name:** MCOMBER MCOMBER & LUBER, PC

**Address:** 54 SHREWSBURY AVE
RED BANK NJ 07701

**Phone:** 7328426500

**Name of Party:** PLAINTIFF : McMillan, Coleman

**Name of Defendant's Primary Insurance Company (if known):** Unknown

**Case Type:** EMPLOYMENT (OTHER THAN CEPA OR LAD)

**Document Type:** Complaint with Jury Demand

**Jury Demand:** YES - 6 JURORS

**Is this a professional malpractice case?** NO

**Related cases pending:** NO

**If yes, list docket numbers:**

**Do you anticipate adding any parties (arising out of same transaction or occurrence)?** NO

**Are sexual abuse claims alleged by: Coleman McMillan?** NO

---

**THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE**
CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** YES

**If yes, is that relationship:** Employer/Employee

**Does the statute governing this case provide for payment of fees by the losing party?** NO

**Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO
    **If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO
    **If yes, for what language:**

**Please check off each applicable category: Putative Class Action?** YES  **Title 59?** NO  **Consumer Fraud?** NO

---

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

<u>12/28/2021</u>
Dated

<u>/s/ CHARLES J KOCHER</u>
Signed